# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ANDREW WILLIAMS, ADVANCED
DIESEL TECHNOLOGIES LLC,
JOHN WILLIAMS, ACKERVILLE
TOWING AND SERVICES, LLC,
HAROLD WILLIAMS, and RALPH
WILLIAMS SERVICE LLC,

                    Plaintiffs,

v.

COUNTY OF WASHINGTON,
MARTIN R. SCHULTEIS, and SGT.
BRUCE THEUSCH,

                    Defendants.

Case No. 23-CV-1668-JPS

# ORDER

## 1.    INTRODUCTION

In December 2023, Plaintiffs Andrew Williams ("Andrew"), Advanced Diesel Technologies LLC ("Advanced Diesel Tech"), John Williams ("John"), Ackerville Towing and Services, LLC, ("Ackerville Towing"), Harold Williams ("Harold"), and Ralph Williams Service LLC ("Ralph Williams") (collectively, "Plaintiffs") sued Defendants County of Washington (the "County"), Martin R. Schulteis ("Schulteis"), and Sgt. Bruce Theusch ("Theusch") (collectively, "Defendants") for allegedly violating their rights under the Equal Protection Clause of the Fourteenth Amendment. ECF No. 1.

Defendants move for summary judgment. ECF No. 20. The motion is fully briefed. ECF Nos. 23, 27,[1] 28. For the reasons discussed herein, the Court will grant in part and deny in part Defendants' motion for summary judgment and dismiss this case.

## 2. FACTS[2]

### 2.1 Plaintiffs

Andrew, Harold, and John own businesses that provide vehicle towing services in the County. Those businesses are Advanced Diesel Tech, Ackerville Towing, and Ralph Williams.

---

[1] Plaintiffs' response in opposition to the motion for summary judgment is, excluding caption and signature block, 46 pages long. ECF No. 27. Per the District's local rules, memoranda in support of or opposition to motions for summary judgment should not exceed 30 pages. Civ. L.R. 56(b)(8)(A). The length of Defendants' response appears to be at least partially attributable to its formatting, so the Court will not strike it in this instance. The Court will, however, disregard the facts section from Plaintiffs' response brief, ECF No. 27 at 5–13, per the Court's pretrial order, ECF No. 2 at 9 ("The parties should omit a facts section from their briefing . . . .").

[2] The parties submitted a joint statement of undisputed facts. ECF No. 24. For purposes of Defendants' motion for summary judgment, the Court will adopt those stipulated facts that are material, with minor, non-substantive edits. Citations to the statement of undisputed facts, and the internal citations therein, are omitted for brevity. The Court occasionally cites to other portions of the record to the extent that they help clarify the events and timeline.

The parties also submitted a joint statement of disputed facts, which the Court draws upon as necessary. ECF No. 25. The Court notes that, in response to many of these asserted facts, Defendants write that they "do not dispute that the events described . . . occurred," but rather that they believe that "the proposed fact is not material and does not preclude summary judgment in" their favor. *See generally id.* As the Court's pretrial order specifically notes, that is not an appropriate basis upon which to dispute an assertion of fact. ECF No. 2 at 8 ("One party's belief that a fact is immaterial is *not* a legitimate basis to refuse to stipulate to the fact."). The Court accordingly considers those facts undisputed.

### 2.1.1  Advanced Diesel Tech

Andrew is the sole owner and operator of Advanced Diesel Tech, which he founded in 2005. Advanced Diesel Tech maintains a physical presence in the County in both Richfield and Allenton, as well as in several locations outside of the County. Since at least 2011, Advanced Diesel Tech's primary business is commercial vehicle and fleet maintenance.

Andrew also owns a business called Advanced Diesel Towing and Recovery ("Advanced Diesel Towing"), which is not a party to this suit and which works in conjunction with Advanced Diesel Tech. *See* ECF No. 22-7 at 18 (describing Advanced Diesel Tech and Advanced Diesel Towing as "basically the same company" and stating that both "operate . . . in the same capacity"). Andrew described Advanced Diesel Tech as being "more regular-customer based" and that it does "a little bit of towing but primarily maintenance or crisis repair." *Id.* Meanwhile, Advanced Diesel Towing "does the stuff on the side of the road," towing and "clear[ing] the scene," *id.*, and it is the entity through which the majority of towing services are invoiced.

In 2009, Andrew approached the Washington County Sheriff's Office (the "WCSO") and requested that Advanced Diesel Tech be placed on the WCSO no-preference tow list (the "tow list"), which law enforcement uses to contact towing services following vehicle accidents and similar occurrences when the vehicle owner does not have a towing company preference. The WCSO granted that request. Since at least 2020, Advanced Diesel Tech is also on tow lists for several other jurisdictions.

For its towing services, Advanced Diesel Tech owns five heavy duty wreckers and eight light duty wreckers. At any given time, these wreckers can be housed at any one of the various locations utilized by Advanced

Diesel Tech and Advanced Diesel Towing. Generally, there are three to four wreckers in Richfield, zero to two wreckers in Allenton, and three to four wreckers in neighboring Dodge County. The operators of the wreckers are also allowed to park the trucks at their homes, and Andrew occasionally permits family and friends to borrow them, so the wreckers are at times located elsewhere.

Calls for towing services are routed through Andrew's personal phone and he responds to the bulk of tow calls personally. If he is not personally available as an operator, the calls are forwarded to a designated person who answers on Andrew's behalf. If Andrew needs additional operators, he primarily relies on his sister-in-law, his neighbor, and his business partner. If those three are unavailable, Andrew relies on his cousins. Neither Advanced Diesel Tech nor Advanced Diesel Towing have any employees. Individual operators who perform services on behalf of either Advanced Diesel Tech or Advanced Diesel Towing are considered independent contractors for purposes of compensation. On occasion, Andrew has also subcontracted towing services to Ackerville and Ralph Williams, as well as to Advanced of Rubicon, an entity owned by Andrew's business partner.

### 2.1.2   Ackerville Towing and Ralph Williams

Harold (Andrew's father) and John (Harold's brother and Andrew's uncle) co-own Ralph Williams and Ackerville Towing. John and Harold obtained full ownership of Ralph Williams from their father, the business's namesake, in 2009. Before that, John and Harold partnered with their father, each having a minority interest in what is now Ralph Williams. Ralph Williams is located in Slinger in the County. John and Harold purchased Ackerville, which is right across the street from Ralph Williams, in 2012.

When John and Harold acquired Ralph Williams and Ackerville, the entities were already on the tow list.

Neither Ackerville nor Ralph Williams have any employees of their own; their operations are carried out by employees of RWS Management, a business also owned by John and Harold. Ralph Williams and Ackerville have a combined total of nine wreckers, although between the two of them, only Ralph Williams has any heavy wreckers.

### 2.2    Defendants

Schulteis is the Sheriff of the County. He has held that position since 2019. Before that, he served for three years as Captain of Administration for the WCSO, during which time he oversaw the Communications Center. He also previously served as a part-time deputy. From 1988 to 1996, Schulteis's father was the County's Sheriff. Prior to his own election in 2019, Schulteis had extensive experience as a tow truck operator. *See* ECF No. 22-1 at 5.

Theusch has worked for the WCSO in some capacity for twenty-eight years and is the current Captain of Operations. He has held that position for the last eight years. Theusch is primarily responsible for overseeing the Patrol Division, Detective Bureau, and Drug Unit. He also supervises the sworn personnel (deputies, patrolmen, etc.) who, when necessary, may call for tow services. He does not supervise the Communications Center nor the dispatchers within it. ECF No. 22-2 at 5. Prior to serving as Captain, he served as a shift lieutenant for eight years, in which role he did supervise dispatchers.

### 2.3    Competing Tow Service

Homer's Towing and Service ("Homer's"), which is not a party to this suit, also provides towing services in the County. Homer's is located off Interstate 41 in Milwaukee County, three miles south of the County's

border. On the WCSO dispatch map, this location is identified on the county line, as is the case for other out-of-county towing businesses.

In January 2020, Homer's opened a location in Richfield in the County, directly adjacent to one of Advanced Diesel Tech's locations. It has since used both its in-County and out-of-County locations to provide towing services in the County.

The record does not indicate how many employees or pieces of towing equipment Homer's has.

### 2.4    History between Plaintiffs and the WCSO

The Williams family—including generations preceding Andrew, Harold, and John—have a long history of displeasure with the WCSO. In 1992, when Schulteis's father was Sheriff, Ralph Williams was removed from the tow list. Since that time, the Williams family has expressed concern over the WCSO's allocation of tow request calls.

In 2008, the prior owner of Ackerville disclosed information to John regarding the volume of no-preference tow calls that Ackerville was receiving from the WCSO. As a result, John and Harold purchased Ackerville with the intention of increasing the number of no-preference tow calls that they could respond to. After the purchase, however, Ackerville began to get fewer tow calls, ECF No. 22-8 at 13, and both Ackerville and Ralph Williams received far fewer no-preference tow calls than Homer's, ECF No. 19-2 at 3. John went to the WCSO on several occasions with concerns regarding no-preference tow-call practices, including the fact that Ralph Williams receives less than two dozen no-preference tow calls per year. ECF No. 19-2 at 2–3. His conversations with Schulteis, Theusch, and others at the WCSO on these occasions were cordial, but his attempts at

persuading the WCSO to allocate more no-preference tow calls to Ralph Williams and Ackerville were fruitless.

### 2.5 The County's Tow Process

The WCSO is responsible for clearing roadways and assisting motorists in cases of disabled vehicles and vehicle accidents. The WCSO Communications Center is extremely busy. It addresses over 1,000 tow requests every year, among tens of thousands of other calls. There are approximately eighteen dispatchers employed in the Communications Center at any given time, *see* ECF No. 22-10 at 27–28, each of whom take and make "hundreds of phone calls" per shift, ECF No. 22-9 at 13. Dispatcher turnover is also common. ECF No. 22-1 at 10; ECF No. 22-9 at 13.

WCSO staff requests a towing service under the following circumstances: (1) to assist a motorist in need of towing/mechanical services; (2) to clear a roadway of disabled/damaged vehicles; and (3) to remove vehicles to a secure location for evidentiary purposes. In most circumstances, towing services are paid for by the vehicle owners, not the County.

When a WCSO deputy needs a towing service in one of the above three circumstances and the vehicle owner can be contacted to indicate a towing company preference, the deputy arranges to have that preferred towing company called, unless the preferred company is for whatever reason not suitable (for example, does not have the appropriate equipment for the job). *See* ECF No. 22-1 at 10. If the vehicle owner cannot be contacted or expresses no preference, the deputy advises the Communication Center to order a no-preference towing request from the tow list.

Eligibility for placement on the tow list requires that a towing service and operator be properly licensed, insured, and equipped in accordance with Wisconsin law. However, the WCSO Sheriff may, at his or her discretion, remove a company from the tow list if the Sheriff believes that there is a justifiable reason to do so. There are no specific criteria for what constitutes a justifiable reason for whether to remove or suspend a company from the tow list.

In the case of a no-preference tow request, the dispatcher in the Communication Center contacts a towing service in the general vicinity of the needed tow that can respond in a reasonable amount of time with the proper equipment. In selecting a service, the dispatcher consults the tow map, reproduced below, which provides the locations of the companies on the tow list. *See* ECF No. 22-1 at 8 (Schulteis deposition) ("[B]ased on the location of where the vehicle is, dispatch will kind of . . . geographically look at which [tow services] are in that area and pick out one of those."). The tow services depicted in blue on the tow map are those that have heavy-duty wreckers. *Id.* at 9.



# TOW MAP

**Towing Locations**
- Towing Service (black dot)
- Heavy Towing (blue dot)
- AAA (red dot)
- Daytime Only (green dot)

**AAA Requests:**
Main Dispatch:
262-787-9052
Bob's Auto
Reliable Towing

September 10, 2024

**Schulteis #1**
Halma Reporting Group

WASHINGTON COUNTY

0       1       2       3       4       5
Miles

Map Updated June 2023 by the Geographic Information Systems (GIS) Department of Washington County.
Information subject to errors and omissions. Undocumented by Washington County.

Washington County 000193

EXHIBIT C

Historically, if the first company contacted does not answer or is unavailable, the dispatcher calls the next closest tow company that could complete the job, and so on and so forth. *See* ECF No. 22-7 at 27, 39. Under the November 2007 iteration of the policy, which was in effect until May 2016, dispatchers were directed to order the "closest available" towing service. ECF No. 22-1 at 11–12; ECF No. 22-8 at 15. Despite that language, Andrew testified that the "closest available" procedure was "never enforced." ECF No. 22-7 at 27. Schulteis testified that the "closest available" language was not construed strictly. ECF No. 22-1 at 12 ("'[C]losest' . . . is . . . more a regional area, not literally . . . measuring . . . ."); *see also* ECF No. 22-10 at 12 (Communications Center supervisor deposition) ("It's not an exact science. They're not taking out a ruler . . . .").

In May 2016, the language of the policy was revised to more accurately reflect operational procedures. ECF No. 22-1 at 16. The updated policy directs dispatchers to "contact a towing service that can respond in a reasonable amount of time with the proper equipment," without explicit reference to geographic proximity. ECF No. 22-4 at 4. Despite the omission of the word "closest," Schulteis testified that the location of the vehicle remains a relevant factor in the dispatcher's decision of which company to call. ECF No. 22-1 at 9. He testified that the operation of the policy was essentially the same notwithstanding the change in language in 2016. *Id.* at 12.

In practice, sometimes the dispatcher's call ends up being to the closest tow company to where the tow is needed, but sometimes it does not. *See* ECF No. 22-1 at 8. The determination of which tow service to call varies per dispatcher and per shift and depends on other variables including whether certain equipment is needed.

The ultimate goal of the dispatcher is to get a tow truck with appropriate equipment to the scene as expeditiously as possible. The dispatchers, based on their experience, are generally aware of which companies have which equipment and would be appropriate for certain tow jobs. Frequently, dispatchers conclude that Homer's is their best bet for a reliable response to a tow request, irrespective of whether Homer's is geographically closest. Schulteis testified that the high volume of calls directed to Homer's is at least partially attributable to Homer's reputation in the area and with the dispatchers and the fact that they "never turn down a tow." ECF No. 22-1 at 30–31 (referencing "customer service" as a factor that dispatchers may consider in determining which tow service to call first and noting that "some towing companies just don't answer the phone . . . [a]nd that's just a known fact by our dispatchers"); *see also* ECF No. 22-2 (Theusch testifying that "[a] lot of the smaller tow companies don't answer their phone calls at night"). Meanwhile, Andrew testified that he believed that the high volume of calls directed to Homer's was at least partially attributable to the fact that a WCSO deputy was friends with one of Homer's drivers. ECF No. 22-7 at 29.

The no-preference tow process is illustrated in WCSO Policy and Procedures #441, but the sergeants responsible for directly supervising dispatchers testified that they were not aware of the existence of that specific procedure.

The dispatchers are expected to attempt to distribute contacts evenly, as practicable, amongst the available tow services on the tow list. Under the policy, the WCSO is not to specifically endorse nor prohibit the use of any specific towing service or operator. For example, if a citizen needs a tow and tells a deputy, "I do not know any companies here, you

tell me who to call," it would be improper for the deputy to steer that citizen to a particular company. However, it is undisputed that on several occasions, WCSO deputies elected to contact Homer's even when the citizen had expressed preference for a different tow company, and John testified that tow operators for Ralph Williams have experienced animosity from deputies when responding to tow requests. ECF No. 22-8 at 19.

On one occasion, after a citizen requested that a deputy contact a specific tow company (not a party to this suit), the deputy told the citizen that the WCSO typically calls Homer's because it's close and sends a tow quickly, and the deputy instructed dispatch to call Homer's instead of the citizen's preferred tow company. On another occasion in September 2020, a citizen reported to the WCSO that his truck was disabled on the roadside and that he had already called Advanced Diesel Tech to tow it. But when Advanced Diesel Tech arrived, the truck was gone. The citizen learned that a deputy had stopped at his disabled truck and called Homer's to tow it. Then, in June 2022, that same citizen was in an auto accident and a WCSO deputy advised him that they were going to call Homer's for a tow. The citizen told the deputy to call Advanced Diesel Tech instead, and the deputy complied. And in March 2023, a citizen contacted the WCSO following an accident and called Ralph Williams to tow his vehicle. The citizen later received a call from Theusch, who inquired about the bill. Theusch told the citizen that he was worried that Ralph Williams might be overcharging the citizen. The citizen felt that this was strange because he had been patronizing Ralph Williams for thirty years and had never had any such concern.

Schulteis has personally expressed to the Communication Center supervisors that dispatchers should rotate the no-preference calls amongst

Case 2:23-cv-01668-JPS    Filed 07/30/25    Page 12 of 29    Document 29

the available services on the tow list to the best of their abilities. And in 2017, Theusch instructed dispatchers to record preference tow requests to assist in tracking these numbers. Communication Center supervisors have also emphasized to dispatchers that they should evenly allocate tow requests, bearing location in mind. ECF No. 22-9 at 12, 14–15; ECF No. 22-10 at 14.

The County uses a tow log to track information associated with tow requests. It records both preference and no-preference tow requests but does not differentiate between the two. The log includes the date, incident number, vehicle location, name(s) of officer(s) involved, name of vehicle owner, license plate, tow equipment requested, tow company used, reason for the tow, and other comments (for example, if there was no answer from the selected tow company or if the selected tow company was unavailable). The main purpose of the tow log is to record what tow service ultimately took the vehicle so that the County can inform citizens of where their vehicles end up. Meanwhile, a Computer Aided Dispatch ("CAD") report is also generated any time an officer or citizen contacts dispatch regarding a tow need; unlike the tow log, the CAD reports generally specify whether calls are preference or no-preference. A review of an eight-month sample of CAD reports produced in this case demonstrates that the vast majority of tow calls handled by WCSO—256 of the 280 reported tow calls—were no-preference calls.

Review of the tow log shows that between 2020 and July 2024, Homer's received more tow calls from WCSO staff than Ackerville, Advanced Diesel Tech, and Ralph Williams combined, even though one of Homer's two locations is not even in the County. For example, in 2021, Homer's received a total of 333 tow calls in the County between its two

locations while Ackerville, Advanced Diesel Tech, and Ralph Williams received a combined total of 264 calls. In 2022, Homer's received a total of 415 calls between its two locations while Ackerville, Advanced Diesel Tech, and Ralph Williams received a combined total of 300 calls. In 2023, Homer's received a total of 478 calls between its two locations while Ackerville, Advanced Diesel Tech, and Ralph Williams received a combined total of 365 calls. In 2024, the gap narrowed, with Homer's receiving 271 calls between its two locations and Ackerville, Advanced Diesel Tech, and Ralph Williams receiving 261 total calls. Again, these figures do not account for whether the tow calls were preference or no-preference, but the sample of CAD reports produced in this case demonstrates that the vast majority of tow calls received are no-preference.

Occasionally, the WCSO receives complaints about tow companies by citizens, and the Sheriff can remove tow companies from the tow list at his or her discretion at any time. On one occasion, a non-party tow company was removed from the tow list for engaging in criminal activity. Although there was no specific requirement that a company be removed from the tow list for such behavior, the Sheriff believed the removal to be justified and did not want the WCSO associated with that company's behavior. Nevertheless, Andrew testified that several other tow companies were not removed from the tow list despite known involvement in criminal activity. ECF No. 22-7 at 34.

Several companies, including Advanced Diesel Tech, have had complaints against them or been removed from the tow list altogether. Schulteis and Theusch have had complaints brought to their attention about Advanced Diesel Tech's conduct in responding to no-preference tow requests. Defendants received complaints from deputies about Advanced

Diesel Tech listening to the police scanner in order to respond to accident scenes without having received a tow call from dispatchers. Schulteis told Andrew that this improperly circumvented the no-preference tow process and could result in a surplus of equipment at the scene, potentially compromising deputies' abilities to safely and efficiently clear scenes. Schulteis was also made aware of complaints that Andrew was complaining to deputies while out on calls about the allocation of tow calls, and that Andrew refused deputies' requests to wear reflective gear at crash scenes. ECF No. 22-1 at 33–34. Defendants have also addressed billing issues with Advanced Diesel Tech, even in the absence of citizen complaints, when Defendants perceived that there were inconsistencies in tow rates or excessive charges.

In November 2011, then-Sheriff Dale Schmidt ("Schmidt"), who is not a party to this suit, removed Advanced Diesel Tech from the tow list because Andrew had dropped off doughnuts at the Sheriff's department "Compliments of Advanced Diesel." ECF No. 19-1 at 2. Advanced Diesel Tech was reinstated to the tow list several months thereafter. ECF No. 22-7 at 31. And in 2018, based upon a complaint lodged by Homer's with Theusch concerning a private dispute between Homer's and Advanced Diesel Tech, Schmidt intervened and removed Advanced Diesel Tech from the tow list again. Advanced Diesel Tech has since been put back on the tow list. *Id.* at 34. Meanwhile, since John and Harold assumed ownership, the WCSO has received no complaints about Ralph Williams or Ackerville and neither company has been removed from the tow list. ECF No. 22-8 at 13.

Since complaints are addressed by Schulteis and Theusch, dispatchers would only be aware of such complaints if deputies or other staff relayed the complaints to the dispatchers. Complaints against tow

companies have no bearing on whether the companies are contacted for a no-preference tow call. They may, however, factor into whether the Sheriff elects to remove a company from the tow list. ECF No. 22-1 at 20. According to Theusch, the fact that a tow service has previously been removed from the tow list has no bearing on whether dispatchers select the service for a tow request following the service's reinstatement to the tow list. ECF No. 22-2 at 8.

### 3. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing Fed. R. Civ. P. 56(a) and *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in the nonmovant's favor. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255 and *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 505 (7th Cir. 2010)).

### 4. LAW AND ANALYSIS

Plaintiffs argue that Defendants favored allocating no-preference tow calls to Homer's—vindictively, to Plaintiffs' disadvantage, and without

rational basis—in violation of Plaintiffs' rights under the Equal Protection Clause. ECF No. 1 at 7–8. The Court addresses two main arguments by Defendants: first, that Andrew, John, Harold, and Advanced Diesel Tech lack standing; and second, that Plaintiffs' equal protection claim fails on its merits.[3] The Court addresses each argument in turn.

### 4.1    Standing

Defendants argue that Andrew, John, and Harold lack standing because they have not suffered an "injury in fact" separate from that allegedly suffered by their respective limited liability companies. ECF No. 23 at 3–4. Further, Defendants argue that Advanced Diesel Tech is not a proper plaintiff and lacks standing because it is a separate legal entity from Advanced Diesel Towing, the "entity [that] [Andrew] would invoice the majority of the towing services through." *Id.* at 4 (citing ECF No. 24 at 3).

In response, Plaintiffs assert without citation to authority that "any injury to the LLC that causes a loss of income to the LLC is passed on directly to the members in its entirety." ECF No. 27 at 17. According to Plaintiffs, "[t]he injury is as direct to the member as it is to the LLC," and therefore Andrew, John, and Harold have personally experienced an injury in fact and have standing to sue individually. *Id.* With respect to Advanced Diesel Tech, Plaintiffs argue that it is a proper plaintiff because it, rather than Advanced Diesel Towing, is the entity listed on the tow list and the entity to which the WCSO dispatches no-preference tow calls. *Id.* at 17–18.

---

[3]Because the Court concludes that the claim fails on its merits, *see infra* Section 4.2, it will not consider various of Defendants' other arguments (for example, that Plaintiffs' claim is largely-time barred, ECF No. 23 at 8–9, or that Schulteis and Theusch are entitled to qualified immunity, *id.* at 15–16).

The Court agrees that Andrew, John, and Harold have failed to demonstrate that they have standing to sue individually, separate and apart from their LLCs. *See In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024) ("As the party invoking federal jurisdiction, [the] plaintiff bears the burden of establishing the elements of Article III standing." (quoting *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015))); *see also Spuhler v. State Collection Serv.*, 983 F.3d 282, (7th Cir. 2020) ("[I]f a plaintiff's standing is questioned as a factual matter . . . the plaintiff must supply proof . . . that standing exists." (citing *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) and *Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996))).

Courts have rejected the notion that, as a general matter, an injury to an LLC is necessarily an injury to its member(s). *See Scruggs v. Wauwatosa Sav. Bank*, No. 17-C-0157, 2017 U.S. Dist. LEXIS 159772, at *9 (E.D. Wis. Sept. 28, 2017), *aff'd*, 723 F. App'x 349 (7th Cir. 2018) (citing *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014)). Although an injury to an LLC "might, in turn, affect [its member(s)] financially" by virtue of their membership in the LLC, "this indirect financial injury is not an injury for which [the member] has standing to seek redress in federal court." *Id.* (citing *Rawoof v. Texor Petrol. Co., Inc.*, 521 F.3d 750, 757 (7th Cir. 2008)); *but see Marx v. Morris*, 925 N.W.2d 112, ¶¶ 38–45 (Wis. 2019) (concluding that "injuries to [an LLC] and to its members are not mutually exclusive because financial injury to [the LLC] flows through to its members just as an injury would if [the LLC] were a partnership rather than an LLC"). Indeed, the point of forming an LLC is typically to insulate its members from personal

financial liability, at least beyond the extent of the members' contributions. *Valinote v. Ballis*, 295 F.3d 666, 668 (7th Cir. 2002).[4]

Plaintiffs cite to Wisconsin Statutes Chapter 183, Uniform Limited Liability Company Law, and contend that "any injury to the LLC that causes a loss of income to the LLC is passed on directly to the members in its entirety." ECF No. 27 at 16–17. But Wisconsin law explicitly provides that any "debt, obligation, or other liability of a limited liability company is solely the debt, obligation, or other liability of the company" and that, as a general matter, members are not "personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation, or other liability of the company solely by reason of being . . . a member." WIS. STAT. § 183.0304(1).[5] The fact that the individual Plaintiffs may consider themselves essentially one and the same with their respective LLCs is of no consequence. *See id.* at § 183.0304(2) ("The failure of a limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a member or manager for a debt, obligation, or other liability of the company.").

---

[4]Plaintiffs' complaint also alleges "damages to [P]laintiffs'] reputation in the community" and "emotional distress." ECF No. 1 at 8. Both parties, however, focus solely on the matter of financial injury in their standing arguments. Since Plaintiffs do not argue in their opposition brief that they have standing by virtue of any reputational or emotional injury, the Court does not analyze any such theory.

[5]In any event, the Court lacks any information with respect to financial contributions that Andrew, John, and Harold may or may not have personally made to their respective LLCs. Nor can the Court assume merely based on their membership in those LLCs that they did, in fact, make any kind of financial contribution. *See* WIS. STAT. § 183.0401(5) ("A person can become a member [of an LLC] without . . . [m]aking . . . a contribution to the limited liability company.").

The thrust of Plaintiffs' allegations is that Advanced Diesel Tech, Ackerville, and Ralph Williams received disproportionately low numbers of tow requests. There is no evidence that any of the income associated with the tow requests of which Plaintiffs were allegedly deprived would have been directed to Andrew, John, or Harold personally, as opposed to their businesses, *see* ECF No. 22-7 at 18, and any property acquired by an LLC "belongs solely to the LLC and not to [its] members." *Pagoudis v. Keidl*, 988 N.W.2d 606, ¶ 29 (Wis. 2023) (citing WIS. STAT. § 183.0701). Furthermore, Plaintiffs do not allege that Defendants were discriminating against Andrew, John, and Harold personally, separate and apart from their LLCs. For all these reasons, Andrew, John, and Harold lack standing to pursue individual claims against Defendants; the Court will grant Defendants' motion for summary judgment in this respect and dismiss Andrew, John, and Harold as plaintiffs from this matter.

The Court next addresses whether Advanced Diesel Tech, as opposed to Advanced Diesel Towing, is a proper plaintiff in this matter.[6] Defendants contend that Advanced Diesel Tech is not a proper plaintiff because it is Advanced Diesel Towing that, in fact, does the majority of Andrew's towing business and through which the majority of Andrew's towing services are invoiced, ECF No. 23 at 4—in other words, that Advanced Diesel Towing, a non-party, was the entity that suffered the losses that Andrew alleges.

_____

[6]Defendants also contend that Advanced Diesel Tech, as opposed to Advanced Diesel Towing, is not "similarly situated" with the other identified towing companies on the tow list. ECF No. 23 at 4. Because that argument diverges from the matter of standing, the Court does not address it here.

The Court will reject this argument, albeit not for the reasons that Plaintiffs proffer. Plaintiffs argue that Advanced Diesel Tech is a proper plaintiff because it is the entity that is listed on the tow list and is the entity that is contacted for tow requests by dispatch. ECF No. 27 at 17. Those facts, without more, do not demonstrate that Advanced Diesel Tech suffered any injury in fact to establish that it has standing.

As earlier noted, the fact that Andrew may have considered these two LLCs "basically the same company," ECF No. 22-7 at 18, also does not necessarily mean that one of them has standing to recover damages suffered by the other. Although Plaintiffs use the phrase "joint venture" in their briefing, ECF No. 27 at 18, the record is insufficiently developed for the Court to determine whether there was, in fact, a joint venture. *See Ruppa v. Am. States Ins. Co.*, 284 N.W.2d 318, 325 (Wis. 1979) (discussing the elements establishing a joint venture, including "an agreement to share profits" and "an express or implied contract establishing the relationship" (quoting *Edlebeck v. Hooten*, 121 N.W.2d 240 (Wis. 1963))). Nor does Plaintiffs' briefing demonstrate how that distinction would make a difference. Accordingly, as far as the Court can discern on the record before it, neither Andrew nor Advanced Diesel Tech can sue to recover losses that were actually suffered by Advanced Diesel Towing. *Pagoudis*, 988 N.W.2d, ¶ 21 ("LLCs are individual entities that are legally separate from their members and from other LLCs, regardless of common ownership.").

Nevertheless, there is sufficient information in the record to support a conclusion that Advanced Diesel Tech has an injury in fact to establish standing. In his deposition, Andrew clarified that he invoices "the majority" of towing services through Advanced Diesel Towing, but not all of them. ECF No. 22-7 at 18. In other words, and according to Andrew's

unrefuted testimony, there is some small portion of towing income that is directed to and invoiced through Advanced Diesel Tech. It would therefore appear that some of the tow requests and accompanying income, of which Andrew believes his business is being deprived in violation of the Equal Protection Clause, would have gone to Advanced Diesel Tech. That this portion of towing income is relatively small, at least compared to that which would have been directed to Advanced Diesel Towing, is of no consequence for purposes of standing. *Pollack v. U.S. Dep't of Just.*, 577 F.3d 736, 744 (7th Cir. 2009) (Cudahy, J., concurring) ("[I]njury-in-fact necessary for standing need not be large . . . ." (quoting *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008))). Advanced Diesel Tech therefore has an injury in fact, albeit only to the extent of that smaller portion of tow requests that Advanced Diesel Tech, as opposed to Advanced Diesel Towing, would have invoiced.

The Court will therefore deny Defendants' motion for summary judgment to the extent it seeks dismissal of Advanced Diesel Tech's claim for lack of standing. To the extent that the Court "deems the distinction between [Advanced Diesel Tech and Advanced Diesel Towing] to be significant" with respect to standing, Plaintiffs request leave to amend their pleadings to add Advanced Diesel Towing as a plaintiff. ECF No. 27 at 18. The Court will deny this request. Because the Court concludes *infra* Section 4.2 that Plaintiffs' claim fails on its merits, granting Plaintiffs leave to amend to add a plaintiff would be futile.

### 4.2    Merits of Equal Protection Claim

Having resolved Defendants' standing arguments, the Court next turns to their arguments on the merits of Plaintiffs' claim under the Equal Protection Clause. The parties agree that Plaintiffs do not allege a

deprivation of any fundamental right and do not claim membership in any suspect or protected class. *See generally* ECF No. 1; ECF No. 23 at 3. Nevertheless, the parties disagree, at least to some extent, on the proper theory under which the Court should review Plaintiffs' claim. Defendants argue that Plaintiffs' theory "is not really a proper 'class of one' claim." ECF No. 23 at 5. Plaintiffs concede that their case "presents a variation on the . . . typical class of one case" but that "this variation should not preclude consideration of" the claim. ECF No. 27 at 18.

Plaintiffs' claim fails irrespective of whether the Court considers it under the "class-of-one" theory or under the standard equal protection framework.[7] For the latter, "[i]n the absence of deprivation of a fundamental right or the existence of a suspect class, the proper standard of review is rational basis," which requires the plaintiff to prove that "the state actor intentionally treated plaintiffs differently from others similarly situated," that "this difference in treatment was caused by the plaintiffs' membership in the class to which they belong," and that "this different treatment was not rationally related to a legitimate state interest." *Srail v. Village of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009) (citing *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000–01 (7th Cir. 2006) and *Smith v. City of Chicago*, 457 F.3d 643, 650–51 (7th Cir. 2006)). In this context, "only palpably arbitrary exercises [of governmental power] . . . can be declared void under the 14th

---

[7] The Court accordingly does not address Defendants' argument that, as independent contractors, Plaintiffs cannot bring a "class of one" claim against the government. ECF No. 23 at 7 ("Other courts around the country have held that no 'class of one' equal protection claim may be brought against the government by an independent contractor aggrieved by a decision not to retain its services or to terminate a contract." (citing *Rountree v. Dyson*, 892 F.3d 681 (5th Cir. 2018))).

Amendment." *Smith*, 457 F.3d at 655 (quoting *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 70 (1913)).

In a typical "class of one" equal protection case, "the plaintiff does not claim to be a member of a class that the defendant discriminates against, but argues only that he is being treated arbitrarily worse than some one or ones identically situated to him." *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005). In such a case, the plaintiff "must, to prevail, 'negative any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* at 634 (quoting *Bd. of Trs. v. Garrett*, 531 U.S. 356, 367 (2001) and citing *Lamers Dairy, Inc. v. U.S. Dep't of Agric.*, 379 F.3d 466, 473 (7th Cir. 2004)). This standard poses "a very significant burden." *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003). It is satisfied when, for example, "the equal protection claim [is] based on . . . the malicious conduct of a governmental agent, in other words, conduct that evidences a 'spiteful effort to "get" him for reasons wholly unrelated to any legitimate state objective . . . .'" *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000) (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)).

Plaintiffs fail to demonstrate an absence of a rational basis for any differential treatment, and they also fail to demonstrate that there was "no conceivable basis for [the disproportionately low allocation of tow calls to them] other than spite or some other improper motive." *Lauth*, 424 F.3d at 633. The record reveals at least one such conceivable and rational basis— Homer's reputation as a reliable and efficient tow service. ECF No. 22-1 at 30–31. Schulteis testified that it was a "known fact by [the] dispatchers" that "some towing companies just don't answer the phone," but that Homer's did not have that reputation. *Id.* According to Schulteis, Homer's was

known to "never turn down a tow" and to "always respond." *Id.* This is unquestionably not a "palpably arbitrary" basis for differential treatment, where the parties agree that the dispatcher's goal is to quickly secure an efficient tow response. *Smith*, 457 F.3d at 655 (quoting *Metropolis Theatre Co.*, 228 U.S. at 70); ECF No. 24 at 7. Plaintiffs offer no evidence to suggest that Homer's does not, in fact, have such a reputation among the dispatchers, nor that their own businesses had a similar reputation such that they should have received more no-preference tow calls. Because they have shown neither that "totally illegitimate animus . . . was the sole cause" for the differential treatment, nor that there was no conceivable rational basis for the differential treatment, their claim fails. *Lauth*, 424 F.3d at 634 (quoting *Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002) and citing *Esmail*, 53 F.3d at 179).

That Andrew believed that the high volume of calls directed to Homer's was at least partially attributable to a WCSO deputy being friends with one of Homer's drivers does not change that conclusion. ECF No. 22-7 at 29. It is Plaintiffs' burden to "eliminate any reasonably conceivable" rational basis for the differential treatment, not merely to point to an alternative possible basis. *See Srail*, 588 F.3d at 946 (quoting *Smith*, 457 F.3d at 652).

The fact that tow allocation decisions were being made by different dispatchers rather than "a single decision-maker" further undermines Plaintiffs' equal protection claim. *United States v. Moore*, 543 F.3d 891, 897 (7th Cir. 2008). The Communications Center employs approximately eighteen dispatchers at any given time. ECF No. 22-10 at 27–28. Multiple witnesses also testified, and Plaintiffs do not dispute, that there is a large "amount of turnover" for dispatchers. ECF No. 22-1 at 41; *id.* at 10 ("[W]e

constantly have new dispatchers."); ECF No. 22-9 at 13 (same). Plaintiffs'
claim requires them to demonstrate that they were intentionally treated
differently "from others similarly situated," but the fact that multiple or
different decision makers were involved "works against a finding of
similarity." *Moore*, 543 F.3d at 897 (concluding that the plaintiff failed to
meet "similarly situated" element in part because his "differential
treatment . . . cannot be attributed to a single decision-maker" (citing *Radue
v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000))).

Plaintiffs also cannot show that they were "treated less favorably
than an institution similarly situated"—here, allegedly, Homer's—because
the record does not indicate specifically how many employees or pieces of
towing equipment Homer's has. *Vision Church*, 468 F.3d at 1002. Schulteis
testified that Homer's has "a lot of equipment," ECF No. 22-1 at 30, but the
specifics are unclear. Plaintiffs assert that "[s]ince [they] own sufficient
equipment to handle any type of towing request, the reasonable inference
. . . is that they have at least the same capacity as Homer's to respond to no-
preference tow calls and, possibly better," and that, thus, "[Plaintiffs'
companies] are comparable to Homer's in any respect relevant to the
allocation of no-preference tow calls." ECF No. 27 at 28. The Court does not
agree that such an inference can reasonably be drawn; Plaintiffs' own
capacity says nothing of Homer's. Plaintiffs have the burden of
demonstrating that their businesses and Homer's are "prima facie identical
in all relevant respects," and no reasonable jury could conclude that they
have met that burden, particularly considering that "evidence of similarity
requires specificity." *Srail*, 588 F.3d at 945–46 (first quoting *Racine Charter
One, Inc. v. Racine Union Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005), then
citing *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004), then

quoting *Maulding Dev., LLC v. City of Springfield*, 453 F.3d 967, 971 (7th Cir. 2006)).

The fact that discretion is involved in the dispatchers' decisions of which tow service to call also supports the Court's conclusion that Plaintiffs' equal protection claim fails. ECF No. 22-1 at 37; ECF No. 22-2 at 14. When state decision-making is "based on subjective and individualized assessments," differential treatment "is an accepted consequence" that does not give rise to a constitutional violation. *Srail*, 588 F.3d at 944–45 (quoting *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008)). In determining which tow service to call first, the dispatcher considers the general location of the tow need, whether specific equipment is needed, the time of day (since not all services on the tow list operate or answer the phone at night, *see* ECF Nos. 22-1 at 37 and 22-2 at 9), and whether a tow company is generally known to "answer the phone quickly and respond." ECF No. 22-1 at 8–9; *id.* at 31 ("[The dispatchers are] not going to call somebody that they know is not going to answer the phone."). A tow service's reputation with respect to customer service may also factor into the decision. *Id.* at 31. How each dispatcher exercises his or her discretion of which service to call also depends on that dispatcher's amount of "experience on the job"—with greater experience comes greater familiarity with the general capabilities and likelihood of response of any given tow service. *Id.* at 9; ECF No. 22-2 at 9, 14 ("[A]s they dispatch more and more of these wrecker services, they kind of know which wrecker service provide[s] a service that's faster than others."). In other words, the dispatcher's decision involves an exercise of discretion based on an evaluation of several factors and is influenced by the dispatcher's own experience, such that different outcomes in selection are inevitable.

For all the reasons stated herein, the Court concludes that no reasonable jury could find that Defendants violated Plaintiffs' equal protection rights. The Court will therefore grant Defendants' motion for summary judgment and dismiss Plaintiffs' equal protection claim on its merits. To the extent that they intended to assert a custom and practice claim against the County, ECF No. 1 at 7 ("Defendants acted according to the policies and customs of the County of Washington."), any such claim must necessarily fail since Plaintiffs have not demonstrated an underlying constitutional violation. *Deeren v. Anderson*, 72 F.4th 229, 237 (7th Cir. 2023) ("Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, . . . (1978), a county may be liable for deprivation of an individual's constitutional rights that result from an official policy, custom, or practice," but only where the plaintiff has "show[n] a violation of his constitutional rights by an individual defendant." (quoting *Novoselsky v. Brown*, 822 F.3d 342, 357 (7th Cir. 2016))); *see also D.B. v. Kopp*, 725 F.3d 681, 687 (7th Cir. 2013) (citing *Palka v. Shelton*, 623 F.3d 447, 455 (7th Cir. 2010)).

**5. CONCLUSION**

For the reasons discussed herein, Defendants' motion for summary judgment will be granted in part and denied in part. The Court will order that Andrew, John, and Harold be dismissed as plaintiffs from this action for lack of standing. Plaintiffs' equal protection claim is otherwise subject to dismissal on its merits.

Accordingly,

**IT IS ORDERED** that Defendants County of Washington, Martin R. Schulteis, and Sgt. Bruce Theusch's motion for summary judgment, ECF No. 20, be and the same is hereby **GRANTED in part and DENIED in part** as stated herein;

**IT IS FURTHER ORDERED** that Plaintiffs Andrew Williams, John Williams, and Harold Williams be and the same are hereby **DISMISSED** as plaintiffs from this matter for lack of standing;

**IT IS FURTHER ORDERED** that Plaintiffs' equal protection claim be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of July, 2025.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge